20-2415
Walker v. Schult

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2020

(Argued:  May 25, 2021                    Decided:  August 16, 2022)

Docket No. 20-2415

_____

ELLIS WALKER,

*Plaintiff-Appellee,*

- v. -

DEBORAH G. SCHULT, Warden, FCI Ray Brook, JACKII SEPANEK, Counselor, FCI Ray Brook,

*Defendants-Appellants,*

RUSSELL PERDUE, Warden, FCI Ray Brook, DAVID SALAMY, Unit Manager, FCI Ray Brook, DAVID PORTER, Associate Warden, FCI Ray Brook, ANNE MARY CARTER, Associate Warden, FCI Ray Brook, STEVEN WAGNER, Associate Warden,

FCI Ray Brook, J.L. NORWOOD, Regional Director, HARLEY LAPPIN, Director, Bureau of Prisons,

*Defendants.*[*]

_____

Before:  KEARSE, LYNCH, and CHIN, *Circuit Judges*.

Appeal by defendants Deborah G. Schult and Jackii Sepanek, federal prison officials, from a judgment entered in the United States District Court for the Northern District of New York following a jury trial before Daniel J. Stewart, *Magistrate Judge*, awarding former prisoner Ellis Walker $20,000 for mental and emotional injury in this action requesting, *inter alia*, damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for his imprisonment in overcrowded conditions that posed a substantial risk of serious damage to his health or safety, to which appellants were deliberately indifferent, in violation of his rights under the Eighth Amendment to the Constitution. On appeal, appellants contend that the district court erred in denying their motions for judgment as a matter of law on the ground (a) that a *Bivens*

[*] The Clerk of Court is instructed to amend the official caption to conform with the above.

damages remedy is not available for such claims, or (b) that even if such a remedy is available, appellants are entitled to qualified immunity. Without addressing the *Bivens* question, we conclude that appellants are entitled to judgment as a matter of law on the grounds (a) that in light of the jury's findings that Walker had not proven any physical injury, the Prison Litigation Reform Act precluded the award of damages for mental or emotional injury, *see* 42 U.S.C. § 1997e(e); (b) that whether or not the facts found by the jury sufficed to establish a violation of Walker's Eighth Amendment rights, any award of nominal damages was precluded by appellants' entitlement to qualified immunity; and (c) that as Walker had been released from prison prior to judgment, his claims for injunctive relief were moot.

Judgment against appellants reversed; remanded for dismissal of the complaint.

MEGAN BEHRMAN, New York, New York (Blake Denton, William O. Reckler, Latham & Watkins, New York, New York, on the brief), *for Plaintiff-Appellee*.

LOWELL V. STURGILL JR., Civil Division, United States Department of Justice, Washington, DC

3

(Jeffrey Bossert Clark, Acting Assistant Attorney General, Brian M. Boynton, Acting Assistant Attorney General, United States Department of Justice, Washington, DC; Antoinette T. Bacon, Acting United States Attorney for the Northern District of New York, Albany, New York; Barbara L. Herwig, Civil Division, United States Department of Justice, Washington, DC, on the brief), *for Defendants-Appellants*.

Samuel Weiss, Washington, DC (for Amicus Curiae Rights Behind Bars), David M. Shapiro, Chicago, Illinois (for Amicus Curiae Roderick & Solange MacArthur Justice Center), *filed a brief in support of Plaintiff-Appellee*.

KEARSE, *Circuit Judge*:

Defendants Deborah G. Schult and Jackii Sepanek ("Defendants"), federal prison officials, appeal from a judgment entered in the United States District Court for the Northern District of New York following a jury trial before Daniel J. Stewart, *Magistrate Judge*, awarding former prisoner Ellis Walker $20,000 for mental and emotional injury in this action requesting, *inter alia*, damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),

4

for his imprisonment in overcrowded conditions that posed a substantial risk of serious damage to his health or safety, to which Defendants were deliberately indifferent, in violation of his rights under the Eighth Amendment to the Constitution. On appeal, Defendants contend that the district court erred in denying their motions for judgment as a matter of law on the ground (a) that a *Bivens* damages remedy is not available for such claims, or (b) that even if such a remedy is available, Defendants are entitled to qualified immunity. Without regard to the *Bivens* question, we conclude for the reasons discussed below that Defendants are entitled to judgment as a matter of law on the grounds (a) that the Prison Litigation Reform Act ("PLRA") precluded the award of damages to Walker for mental or emotional injury because the jury found he had not proven that he suffered any physical injury, *see* 42 U.S.C. § 1997e(e); (b) that if a constitutional violation by these Defendants was proven, their entitlement to qualified immunity foreclosed an award of nominal damages; and (c) that as Walker had been released from prison prior to judgment, his claims for injunctive relief were moot.

5

## I. BACKGROUND

In November 2008, Walker, a federal prisoner, was sent to the Federal Correctional Institution Ray Brook in New York ("FCI Ray Brook" or "Ray Brook"), where he was placed in a cell (or "Cell 127") with five other inmates. In March 2011, he commenced the present action *pro se* seeking "relief and/or damages" for the conditions of his confinement at Ray Brook from the start of that confinement--having made numerous complaints to the warden and other prison staff, both in person and through the official prison grievance system, with no success. (Complaint at 1.) The conditions of which Walker complained included lack of sufficient space in the 190.62-square-foot Cell 127 to accommodate six prisoners, lack of ventilation, and lack of heat in winter; inadequate bed size for Walker (who was 6'4" tall and weighed 255 pounds) and lack of a ladder for him to access the upper bunk to which he was assigned; and unsanitary cell conditions generated by his cellmates, and exacerbated by the denial of sufficient cleaning supplies.

Walker requested damages, an uncrowded cell, and a reduction of his prison term by five times the number of days of his housing in Cell 127. In April 2011, Walker was moved to a two-man cell, having been in Cell 127 for 880 days.

Walker's case was eventually tried in 2020. The jury did not find that Walker had suffered any physical injury. However, it found that his "imprisonment in Cell 127 . . . posed a substantial risk of serious damage to his health or safety," to which Schult and Sepanek had been "deliberately indifferent," and it awarded him compensatory damages of $20,000. (Jury Verdict Form at 2, 4.) On this appeal, Defendants do not challenge the jury's factual findings or the sufficiency of the trial evidence to support them. Walker's detailed allegations--which were the subject of evidence at trial (*see* Part I.C. below)--have been described in prior opinions of the district court and this Court, *see Walker v. Schult*, No. 9:11-CV-0287, 2012 WL 1037441 (N.D.N.Y. Jan. 20, 2012) (Report and Recommendation of Magistrate Judge Randolph F. Treece) ("*Walker I*"), *adopted*, 2012 WL 1037442 (N.D.N.Y. Mar. 27, 2012), *affirmed in part, vacated*

7

*and remanded in part*, 717 F.3d 119 (2d Cir. 2013) ("*Walker II*"), familiarity with which is assumed.

A.  *The Motion To Dismiss for Failure To State a Claim*

Walker's *pro se* complaint named nine individuals as defendants, including Schult who was the warden at FCI Ray Brook during most of Walker's confinement there; Russell Perdue, who became Ray Brook's warden just weeks before Walker commenced this action; and Sepanek, who was "counselor" in Walker's area at Ray Brook and who was in charge of distributing cleaning supplies.  The other defendants were Ray Brook's former unit manager David Salamy, three Ray Brook associate wardens, and two United States Bureau of Prisons ("BOP") officials who were not stationed at Ray Brook.  The defendants moved to dismiss the complaint, contending principally that Walker had not exhausted his administrative remedies and that his complaint failed to state an Eighth Amendment claim.

The motion to dismiss was referred, for report and recommendation, to Magistrate Judge Randolph F. Treece who stated that

8

the defendants' exhaustion challenge could not be resolved on the face of the complaint, but recommended that the complaint be dismissed for failure to state a claim. Judge Treece noted that in order to state a valid claim under the Eighth Amendment based on the conditions of his confinement, a plaintiff must set out facts plausibly indicating, *inter alia*, that "the conditions were so serious that they constituted a denial of the 'minimal civilized measure of life's necessities,'" *Walker I*, 2012 WL 1037441, at \*5 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991)). The magistrate judge considered each aspect of the conditions of which Walker complained and found that none, singly or in combination, reached the level of an Eighth Amendment violation. *See Walker I*, 2012 WL 1037441, at \*5-\*8. The recommendation to grant defendants' motion to dismiss the complaint for failure to state a claim was summarily accepted by the district court, and the complaint was dismissed.

Walker filed an appeal *pro se*; counsel subsequently appeared for him (and thereafter continued to represent him in the district court). In *Walker II*, this Court vacated the dismissal of the complaint, except as to the two BOP officials who were not alleged to have had personal

9

involvement in the claimed constitutional violation, and whose dismissal was not challenged on appeal. *See* 717 F.3d at 123 n.4, 130. We partly summarized Walker's plausible factual allegations as to the conditions knowingly allowed by the other seven defendants as follows:

> [F]or approximately twenty-eight months, he was confined in a cell with five other men, with inadequate space and ventilation, stifling heat in the summer and freezing cold in the winter, unsanitary conditions, including urine and feces splattered on the floor, insufficient cleaning supplies, a mattress too narrow for him to lie on flat, and noisy, crowded conditions that made sleep difficult and placed him at constant risk of violence and serious harm from cellmates.

*Id*. at 126. We noted that it was well settled that a prisoner's Eighth Amendment right not to be subjected to cruel and unusual punishment could be violated by, *inter alia*, prolonged exposure to extreme temperatures without adequate ventilation; conditions that prevent sleep, which is critical to human existence; unsanitary conditions in a prison cell; and conditions that place a prisoner at a substantial risk of serious harm from other inmates--as well as by overcrowding if combined with other adverse conditions. *See id*. at 126-29. As Walker plausibly alleged those conditions, as well as deliberate indifference by the seven defendants on

10

site at FCI Ray Brook, we held that he "ha[d] plausibly alleged cruel and unusual punishment in violation of the Eighth Amendment." *Id*. at 126. We noted that "further facts [we]re required" for a determination of the defendants' claim of entitlement to qualified immunity. *Id*. at 130.

B. *Pretrial Proceedings on Remand*

On remand, the defendants made several motions for summary judgment dismissing the complaint. First, they contended that Walker had not exhausted his administrative remedies as to some of his complaints. The district court denied this motion, ruling that Walker asserted a single multi-faceted claim about prison conditions and that he had not asserted new, unexhausted claims. *See* Decision and Order dated December 11, 2014. A year later, the defendants sought summary judgment on the grounds that they were entitled to qualified immunity from Walker's claims and that the relief requested by Walker was precluded by the PLRA, citing 42 U.S.C. § 1997e(e). As discussed in Part II.B.2.a. below, the court denied the motion in a Memorandum-Decision and Order dated August 9, 2016, finding that there were genuine issues of material fact to

11

be tried. *See Walker v. Schult*, No. 9:11-CV-0287, 2016 WL 4203536 (N.D.N.Y. Aug. 9, 2016) ("*Walker III*"). Walker thereafter agreed to the dismissal of his claims against the remaining defendants other than Sepanek, Schult, and Schult's successor Perdue.

The defendants' third summary judgment motion argued that under the Supreme Court's 2017 decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), a *Bivens* remedy was unavailable to Walker because his claims present a new context and because special factors counsel against expanding the *Bivens* remedy to this context. This motion was made in March 2019, two months before the then-scheduled start of trial; the district court summarily denied it as untimely. Thereafter, the parties consented to have the trial conducted before a magistrate judge, and the case was reassigned to Judge Stewart.

C. *The Trial Evidence*

Walker's claims against Schult, Sepanek, and Perdue were tried in January 2020. The evidence included testimony from Walker and a

former cellmate, from Schult, Sepanek, Perdue, and other former FCI Ray Brook employees, and from two experts called by Walker.

Walker and his former Cell 127 cellmate Furman Odom described crowded, noisy, unsanitary, and unsafe conditions in the cell, and threats of violence from their fellow cellmates. Walker testified that because of the overcrowding, there were "numerous fights" in the cell (Tr. 126, 156), as the lack of space made it easy to "bump up against" cellmates or their property, and his cellmates were "just looking for a reason [to fight], just being crowded in the cell like that" (*id*. at 120-21, 158; *see also id*. at 161-62 ("Being in the crowded space, . . . they would just fight, and any little thing would trigger anybody off.")). He described instances in which trivial inadvertent actions--or sensible comments such as objections to urine on the cell floor--triggered violent attacks with fists or makeshift knives. (*See*, *e.g.*, *id*. at 121-26.)

Odom likewise testified that the "crowded," "stuffy," and "noisy" conditions in Cell 127 led to arguments that turned into physical fights, which were "mostly about space." (*Id*. at 375-76.) Because of the

potential for violence, Odom "slept with a weapon[,] . . . a sharpened toothbrush."  (*Id*. at 405.)

Walker stated that with "six of us crowded in th[e] cell," the cell "was never clean"; there was always food on the floor, urine on and around the one usable toilet, and pervasive offensive smells.  (Tr. 138-39.) Walker and Odom testified that they were not given adequate cleaning supplies (Walker was once without cleaning supplies for a month (*see id*. at 143)), and that when supplies were made available, the supplies were "watered down" (*id*. at 390), not strong enough to actually get the cell clean (*see id*. at 141-42).

Walker also testified about his persistent requests to Sepanek and Schult for more cleaning supplies or for a transfer to a different cell. "[T]ime after time," Walker asked Sepanek to move him out of Cell 127 and into a two-man cell, but Sepanek refused.  (*Id*. at 259.)  Walker said he seemed to be "at the bottom" of Sepanek's list, and never moving up. (*Id*.; *see also id*. at 236.)  Sepanek's own testimony supported Walker's observation.  She testified that she had assigned Walker to a top bunk in Cell 127 and had the power to move him to a lower bunk or to a two-man

14

cell (*see id*. at 653-55)--a two-man cell generally being "more favorable than six-man cells" because in a six-man cell "one inmate could be ganged up on by five different inmates" (*id*. at 665-67). But when "beds would open up in the two-man cells," Walker was not moved because Sepanek allowed the remaining occupant to choose his new cellmate (*id*. at 667-68).

Walker testified that in addition to making in-person requests of and complaints to Schult and Sepanek, he filed several rounds of complaints through the FCI Ray Brook grievance system, with no greater success. For example, in his initial, first-level grievance, directed to Sepanek during his first year in Cell 127, he complained that the cell was "so crowded" that he could not "move around without saying excuse me a thousand times a day"; that "because there [we]re so many gangs" and no "duress buttons" to call for help when there was a fight, "someone [wa]s going to be hurt very bad"; and that "[w]ith this overpopulation and crowded living conditions, someone is going to get killed." (Tr. 156-57; *see also id*. at 219 (the entire prison was crowded).) Walker testified that all of his complaints "derive[d] from overcrowding the cell." (*Id*. at 226.)

15

Sepanek testified that she could have moved Walker to a different cell in response to his grievance, but she moved other inmates instead. (*See, e.g.*, Tr. 678, 687, 700-02.) After two weeks during which she "didn't take any steps to resolve Mr. Walker's concerns" (*id.* at 683), she sent Walker a response of "'[u]nable to resolve'" (*id.* at 681; *see also id.* at 158-59 (Walker testifying that "'[u]nable to resolve'" was Sepanek's only response to his grievance)).

Thereafter, Walker pursued his grievance by appealing Sepanek's non-decision first to Schult, next to the regional BOP office, and then to the BOP central office--all on forms he obtained from Sepanek. (*See* Tr. 688-94.) The only response Walker received from Schult was a statement that

> "FCI Ray Brook is able to accommodate the inmates currently housed here while continuing to operate a safe and secure institution. Staff effectively manage the institution through sound correctional management practices, and the safety and security of staff and inmates remain our highest priority."

(*Id.* at 163.) Schult never spoke with Walker about his grievance, and she did not inspect his cell. (*See id.* at 164-65.)

16

Walker remained housed in Cell 127 until shortly after Schult was replaced by Perdue as warden. Sepanek acknowledged that in all, while Walker was in Cell 127, he had a total of 38 different cellmates, only one of whom occupied that cell longer than Walker. (*See id*. at 698.)

Schult, Sepanek, and other former FCI Ray Brook employees contradicted Walker's account of the conditions in Cell 127 and his attempts to complain about those conditions. They testified that Cell 127 was not, and could not have been, as dangerous, dirty, loud, and hot as Walker claimed. Schult and Sepanek also testified that they did not recall Walker complaining to them about the conditions in Cell 127 or requesting to move into a two-man cell. (*See, e.g.,* Tr. 675-76, 841.)

Philip Hamel, Ray Brook's former safety manager, testified with respect to certain requirements of the American Correctional Association ("ACA"), an industry organization that set mandatory and recommended standards for safe and secure confinement in prisons. The BOP required prisons in the federal system to be accredited by the ACA; Hamel had been Ray Brook's ACA accreditation manager. FCI Ray Brook was required to comply with ACA's mandatory standards and was

17

"strongly encouraged to comply with" those that were nonmandatory. (Tr. 597.)

One of the ACA nonmandatory standards was that a cell should have a minimum of 25 square feet of unencumbered, usable space per inmate (*see* Tr. 467). Major governmental or professional entities, such as the New York Department of Corrections and the United States Public Health Service, recommended that a jail or prison cell have at least 50 or 60 unencumbered square feet per inmate, as "the minimal amount of free space that people need . . . in order to maintain normal psychological functioning." (*Id*. at 963.) Of all the relevant groups, ACA's recommended minimum was the lowest, at 25 square feet per prisoner. (*See id*.)

Hamel testified that the six-man cells were created at Ray Brook in 2000 when it was receiving an influx of prisoners for whom it did not have enough cells. (*See* Tr. 639.) He and former unit manager Salamy testified that the six-man cells were improvised by combining two small adjacent cells, removing the wall between them, and adding another bunk bed. (*See id*. at 641-42, 1056 (there "were two two-man cells,

18

designed for four inmates, but they took down the center wall and simply added a bunk").)  The parties stipulated that the dimensions of Cell 127 totaled 190.62 square feet (*see, e.g., id.* at 470-71); and at trial it was calculated that Cell 127's "unencumbered space"--*i.e.,* "space not encumbered by furnishings or fixtures" including beds, toilets, sinks, desks, and lockers (*id.* at 467)--totaled 99.07 square feet (*see id.* at 473). Thus, for six inmates (and with no space allotted for chairs) the unencumbered space in Cell 127 was only some 16.51 square feet per prisoner.  (*See id.* at 473-75.)

One of Walker's expert witnesses was a professor who had 50 years' experience working in corrections, including being the warden in a New York correctional facility, the chief executive officer of the Pennsylvania prison system (which at the time was the fifth largest prison system in the United States), and the commissioner of corrections in New York City.  Having reviewed, *inter alia*, the dimensions and photographs of Cell 127, he testified that it was "one of the most severely overcrowded cells or . . . multiple occupancy housing units [he had] ever observed" (Tr. 482).  He noted that "16.5 square feet per person is [a] four-foot

19

square. . . . We're talking about each man having a four[-]foot square. That's pretty tight." (*Id*. at 528.)

Ray Brook records showed that of the 880 days when Walker was housed in Cell 127, there were only 39 days when it housed four prisoners; and the longest period of continuous four-man occupancy was 11 days. (*See id*. at 476-77.)

Walker's other expert witness was a physician and professor who had been specializing in prison psychiatry and prison mental health since 1967. He had been, *inter alia*, the director of mental health for the Massachusetts prison system for a decade; for another decade he was the principal investigator in an experimental program in the San Francisco jails that "reduce[d] the in-house violence to zero" (Tr. 954). He opined that the combination of conditions to which Walker testified--to wit, "overcrowding in the cell," "grossly unsanitary conditions in the cell," "exposure to extremes of heat and lack of adequate ventilation," "chronic and severe sleep deprivation," and "the ongoing constant fear and anxiety" of being "assaulted or even killed by one of one's cellmates," especially considering the 2½-year duration--"constituted cruel, inhuman, and

20

degrading treatment or punishment" amounting to "a form of torture." (*Id.* at 958, 962; *see, e.g., id.* at 956-62; *id.* at 960 ("psychological torture" can be "even more painful than . . . physical torture").)

After Walker rested his case and again after the close of all the evidence, the defendants moved pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law on the grounds, *inter alia*, that a *Bivens* action is not available for a conditions-of-confinement claim such as that asserted by Walker, and that in any event Schult, Perdue, and Sepanek were entitled to qualified immunity. The court reserved decision.

D. *The Jury's Verdict*

The case was submitted to the jury in two stages. First the jury was given a verdict form that asked initially:

> Has the Plaintiff, Ellis Walker, proven by a preponderance of the evidence, that his imprisonment in Cell 127 denied him the minimal civilized measure of life's necessities or basic human needs *or* that the conditions in Cell 127 posed a substantial risk of serious damage to his health or safety?

21

(Jury Verdict Form, Part I.1. (emphasis added).) The jury, instructed simply to check "Yes" or "No," answered this question "Yes" (*id*.), which did not reveal which of the presented alternatives it had found (or whether it had found both).

In response to additional questions on that form, the jury found that Walker had proven that Schult and Sepanek--but not Perdue--had been "deliberately indifferent to [Walker] in violation of [Walker's] Eighth Amendment rights" (*id*. Part I.2.), and that the "actions" of Schult and Sepanek--but not Perdue--"were a proximate cause of an injury to" Walker (*id*. Part II.1.). As to the actions of the defendants whom the jury identified as deliberately indifferent and as causing Walker injury, the jury was asked:

> Do you find by a preponderance of the evidence that [Walker] suffered a *physical* injury as a result of th[at] conduct . . . ?

(*Id*. Part III.1. (emphasis added).) The jury answered "No." (*Id*.) Finally, the verdict form asked:

> *Considering the elements in the Court's instructions with regard to compensatory damages*, what amount of damages do you award to . . . Walker for violation of his

22

constitutional rights?   (Note:   First, that an award of compensatory damages may include damages to compensate for physical harm as well as pain, *mental anguish, emotional distress, personal humiliation, and other such suffering . . . .*).

(*Id*. Part III.2. (emphases added).)   The language following "Note" reiterated the court's oral instructions to the jury (*see* Tr. 1157-58).   The jury awarded $20,000.

After answering the questions on the Jury Verdict Form, the jury was given special interrogatories in aid of the court's ultimate decision as to whether Schult or Sepanek was entitled to qualified immunity.   First, the jury was asked to identify which of five claimed "conditions of cell 127" it had found deprived Walker "of his basic life necessities *or* posed a substantial risk of serious damage to his health or safety"; the five conditions listed were:

   a.  overcrowding/lack of space
   b.  lack of sanitation/cleaning supplies
   c.  threats of violence/lack of safe living conditions
   d.  inability to sleep
   e.  excessive heat or lack of ventilation.

(Court Exhibit 6 (emphasis added).)   Of these possibilities, the jury responded that it had found only two:   "[a.] overcrowding/lack of space"

23

and "[c.] threats of violence/lack of safe living conditions." (Special Interrogatory Answer ("Int.") 1.)

In response to additional questions, the jury found that neither Schult nor Sepanek "establish[ed] she was **unaware** of" either of those two conditions (Ints. 2-3 (emphasis in original)), and that neither Schult nor Sepanek "establish[ed] that she reasonably responded to [Walker's] complaints about the conditions" of Cell 127 (Ints. 4-5).

E. *The Court's Posttrial Rulings*

In a Post-Trial Decision and Order dated May 29, 2020, *see Walker v. Schult*, 463 F.Supp.3d 323 (N.D.N.Y. 2020) ("*Walker IV*"), the district court turned to the defendants' Rule 50 motions for judgment as a matter of law, noting that the motions by Perdue were moot because the jury had ruled in his favor. Schult and Sepanek pursued dismissal on the grounds that a *Bivens* damages remedy was not available for claims such as those here; that even if a *Bivens* damages remedy were theoretically available, and if the trial evidence supported a determination that Walker had been denied an Eighth Amendment right to be moved to a less

24

crowded cell--which Defendants disputed--such a right had not been clearly established, and thus Defendants were entitled to qualified immunity from claims for damages; and that if they did not have qualified immunity, the damages awarded by the jury should be set aside and judgment entered only for nominal damages of $1 because, in light of the jury's finding that Walker had not proven any physical injury, an award of damages for his mental and emotional injury was foreclosed by the PLRA in 42 U.S.C. § 1997e(e). The court rejected each argument.

As relevant to our decision here, the district court, after concluding that a *Bivens* remedy was available, *see Walker IV*, 463 F.Supp.3d at 329-32, concluded in part that neither Schult nor Sepanek was entitled to qualified immunity. It found (*see* Part II.C. below) that a prisoner's right to "living conditions that were safe and humane and did not deprive him of basic human needs" had been clearly established at the time of Walker's confinement in Cell 127. *Id*. at 337 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994), and *Rhodes v. Chapman*, 452 U.S. 337 (1981)). And in light of the jury's findings that Schult and Sepanek "had actual knowledge of the conditions which posed a serious risk to [Walker's]

25

health and safety, and that they were deliberately indifferent to that risk," *id.*, they had not proven that their conduct was objectively reasonable, *id.* at 337-38.

The court rejected Defendants' contention that if they were not entitled to qualified immunity, the judgment against them should be reduced to one for $1 as nominal damages because of the § 1997e(e) bar of compensatory damages for emotional and mental injury in light of the jury's finding of no physical injury. Walker, although apparently not contesting the proposition that § 1997e(e) imposes such a bar, argued that Defendants had waived that argument by failing to assert it in their answers as an affirmative defense. As described in Part II.B.2. below, the district court agreed that the PLRA barrier had been waived.

Judgment was entered in favor of Walker against Schult and Sepanek for $20,000. *See* Judgment, May 29, 2020. Although the complaint had also asked for various forms of injunctive relief, those requests had become moot. Walker had been transferred from Cell 127 to a two-man cell in 2011, a month after filing this action; and prior to trial, he had been released from prison. (*See* Tr. 168; *see also* Dkt. No. 119

26

(Walker's change-of-address letter to the district court, dated March 30, 2016).)

# II. DISCUSSION

On this appeal, Schult and Sepanek do not challenge the factual findings made by the jury or the sufficiency of the evidence to support those findings. Rather, they contend that the district court should have granted judgment as a matter of law in their favor either because a *Bivens* damages remedy was unavailable for Walker's claim based on being housed in an overcrowded cell, or because they were entitled to qualified immunity, Walker having no clearly established Eighth Amendment right to relief for such a claim. In light of the jury's finding that Walker did not prove that he suffered any physical injury as a result of the complained-of overcrowding, we conclude that Defendants are entitled to dismissal of the complaint on the grounds (a) that the jury's award of damages to Walker for mental or emotional injury should have been set aside as foreclosed by the PLRA, *see* 42 U.S.C. § 1997e(e); (b) that although

27

an award of nominal damages would normally be appropriate if there is a proven violation of constitutional rights without compensable injury, Defendants are entitled to qualified immunity from such an award; and (c) that Walker's requests for nonmonetary relief had become moot prior to the entry of judgment.  In light of these conclusions, we need not address the question of whether a *Bivens* remedy was available for Walker's conditions-of-confinement claim.

A.  *An Eighth Amendment Overview, and the Posture of This Case*

We begin with an overview of Eighth Amendment principles and the procedural posture of this case.  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on persons convicted of crimes.  U.S. Const. amend. VIII.  This prohibition has both objective and subjective components:  official conduct that was "harmful enough" to be characterized as "punishment," and a "sufficiently culpable state of mind," *Wilson v. Seiter*, 501 U.S. 294, 303, 297-98 (1991).

Cruel and unusual punishment in violation of the Eighth Amendment can take many shapes, whether by design, such as

"whipp[ing]," *e.g., Hutto v. Finney*, 437 U.S. 678, 682 n.4 (1978), or placement in prolonged isolation in cramped cells without adequate food, *see, e.g., id*. at 682-87; or by deliberate indifference, for example to a prisoner's serious medical needs, *see, e.g., Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976), or to his exposure to excessive amounts of a toxic substance, *see, e.g., Helling v. McKinney*, 509 U.S. 25, 27-28, 35-36 (1993) (tobacco smoke); *Vega v. Semple*, 963 F.3d 259, 273-77 (2d Cir. 2020) (radon gas), or to his need for a "meaningful opportunity for physical exercise," *see, e.g., McCray v. Lee*, 963 F.3d 110, 118, 120 (2d Cir. 2020), or to his need for protection from a known risk of violence, *see, e.g., Farmer v. Brennan*, 511 U.S. 825, 832-34, 847 (1994); *Morgan v. Dzurenda*, 956 F.3d 84, 88-89 (2d Cir. 2020).

In the present case, the source of the dangers of which Walker complained was overcrowding, which created the prison-wide potential for increased violence and correspondingly diminished safety. (*See* Tr. 226 (all of Walker's complaints "derive[d] from overcrowding the cell"); *id*. at 219, 1055-56 (both sides testifying that the prison as a whole was overcrowded).) However, "overcrowding" itself, *i.e.*, "confin[ing] cellmates

29

too closely," does not violate the prohibition against cruel and unusual punishment unless it is accompanied by some treatment that "deprive[s] inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 340, 347 (1981) (addressing "double celling").

In *Rhodes*, despite the fact that the prison "housed 38% more inmates at the time of trial than its 'design capacity,'" *id.* at 343, the district court's other factual findings made after a bench trial--and after a surprise on-site inspection by the trial judge--included the following:

> The *food was "adequate in every respect*," and respondents adduced no evidence "whatsoever that prisoners have been underfed or that the food facilities have been taxed by the prison population." The *air ventilation system was adequate*, the cells were substantially *free of offensive odor*, the *temperature in the cellblocks was well controlled*, and *the noise in the cellblocks was not excessive. . . .* As to violence, the court found that *the number of acts of violence at [the prison] had increased* with the prison population, but *only in proportion to the increase in population*. Respondents failed to produce evidence establishing that double celling itself caused greater violence, and the ratio of guards to inmates at [the prison] satisfied the standard of acceptability offered by respondents' expert witness.

*Id.* at 342-43 (internal citation omitted) (emphases added).

30

The trial court's legal conclusion that the overcrowding violated the Eighth Amendment, which was summarily affirmed on appeal, was reversed by the Supreme Court. The Supreme Court noted that "[t]o the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 347. "[T]he Constitution does not mandate comfortable prisons"; and "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 349, 347. The *Rhodes* Court observed that

> [v]irtually every one of the [trial] court's findings tends to *refute* [the plaintiffs'] [Eighth Amendment] claim. The double celling made necessary by the unanticipated increase in prison population did not lead to deprivations of essential food, medical care, or sanitation.

*Id*. at 347-48 (emphasis in original). Thus, the legal "conclusion that double celling" as shown at the prison facility at issue "constitute[d] cruel and unusual punishment [wa]s insupportable." *Id*. at 347; *id*. at 349 ("There [was] no constitutional violation . . . .").

In *Wilson*, the Supreme Court reiterated its "observation in *Rhodes* that conditions of confinement, 'alone or in combination,' may"

31

violate the Eighth Amendment if they "deprive prisoners of the minimal civilized measure of life's necessities," *Wilson*, 501 U.S. at 304 (quoting *Rhodes*, 452 U.S. at 347), as well as *Rhodes*'s holding that overcrowding itself did not amount to cruel and unusual punishment. The Court thus emphasized that "only those deprivations denying 'the minimal civilized measure of life's necessities[]' . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347); *see*, *e.g.*, *Helling*, 509 U.S. at 32 (government violates the Eighth Amendment when it "renders [a prisoner] unable to care for himself, and at the same time fails to provide for his basic human needs--*e.g.*, food, clothing, shelter, medical care, and reasonable safety" (internal quotation marks omitted)).

As to the merits of the claims asserted by Walker, we bear in mind that this action has proceeded through to judgment. What Walker alleged in his complaint is no longer a proper point of reference; nor is the issue here whether he adduced sufficient evidence to support those allegations. The case was tried to a jury, which found certain facts, but not others, established. And "when the jury has decided a factual issue,

its determination . . . preclud[es] the court from deciding the same fact issue in a different way." *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir. 1988). Thus, with respect to legal conclusions as to whether the PLRA permitted an award of damages to Walker for his mental or emotional injury, whether an Eighth Amendment violation was proven, and whether Defendants are entitled to qualified immunity, the dispositive perspective is the facts as found by the jury.

B. *The PLRA*

Congress enacted the PLRA in 1996, revising certain sections of Title 28 of the United States Code, *inter alia*, and introducing new provisions in Title 42, "[i]n an effort to address the large number of prisoner complaints filed in federal court." *Jones v. Bock*, 549 U.S. 199, 202 (2007). "Among other reforms, the PLRA mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures before filing suit. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(a)." *Jones*, 549 U.S. at 202. Thus, § 1997e(a) provides:

33

**(a) Applicability of administrative remedies**

> *No action shall be brought with respect to prison conditions* under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*.

42 U.S.C. § 1997e(a) (emphases added).  Congress "enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits" with respect to prison conditions.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  The "failure to exhaust" in accordance with § 1997e(a) "is an affirmative defense under the PLRA."  *Jones*, 549 U.S. at 216.

One of the other reforms introduced by the PLRA provides, in pertinent part, as follows:

**(e) Limitation on recovery**

> *No Federal civil action may be brought by a prisoner* confined in a jail, prison, or other correctional facility, *for mental or emotional injury suffered while in custody without a prior showing of physical injury* . . . .

42 U.S.C. § 1997e(e) (emphases added); *see also id*. (recovery for mental or emotional injury also permitted for a showing of "the commission of a sexual act (as defined in section 2246 of Title 18)").

34

1. *General Judicial Interpretation of the Scope of § 1997e(e)*

As pertinent here, § 1997e(e) is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages. *See, e.g., Davis v. District of Columbia*, 158 F.3d 1342, 1345, 1348-49 (D.C. Cir. 1998) (affirming a *sua sponte* dismissal for failure to state a claim where no prior physical injury from privacy-violating disclosure of prisoner's medical records was either alleged or possible); *Cassidy v. Indiana Department of Corrections*, 199 F.3d 374, 376 (7th Cir. 2000) ("*Cassidy*") ("§ 1997e(e) precludes [a] prisoner's claim for [an] emotional injury" as to which "there is no prior showing of physical injury" (internal quotation marks omitted)).

Despite the breadth of § 1997e(e)'s language, a majority of the Circuits that have considered this subsection have interpreted it--insofar as claims of mental or emotional injury are concerned--as barring only awards of compensatory damages, not as barring nominal damages, punitive damages, or injunctive relief. *See, e.g., Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) ("*Thompson*") (§ 1997e(e) "does not restrict a

35

plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief"); *Searles v. Van Bebber*, 251 F.3d 869, 878-81 (10th Cir. 2001) (§ 1997e(e) does not foreclose nominal or punitive damages); *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000) (same); *Cassidy*, 199 F.3d at 375-77 (affirming grant of motion for partial judgment on the pleadings dismissing, as barred by § 1997e(e), only "Cassidy's claims for recovery for mental and emotional injuries" without allegation of physical injury, while allowing pursuit of compensation for other injuries such as loss of freedom of movement and loss of access to prison programs). (*See also* Brief for United States of America as Intervenor in *Thompson*, 284 F.3d 411 (No. 00-0253), 2001 WL 34095056, at *8-*9 ("[A]mong the appellate courts [considering] the scope of § 1997e(e)'s coverage," "there is generally a consensus" that while "failure to allege prior physical injury bars compensatory damages for mental or emotional injuries," "Section 1997e(e) is not a bar to injunctive or declaratory relief."); *id*. at *9 ("Nor is [§ 1997e(e)] a complete bar to monetary damages. The statute does not prohibit claims for nominal damages brought solely to vindicate a constitutional right, or claims for

36

punitive damages to punish for violation of a constitutional right, as long as those damages are not based, in any way, on mental or emotional injury.").)

Whether or not nominal or punitive damages were intended to be permissible, it is clear that § 1997e(e)--perhaps reflecting concern for difficulties in assessing mental or emotional injury, and perhaps mindful that imprisonment entails "routine discomfort," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)--bars an award of compensatory damages to a prisoner suing for mental or emotional injury resulting from conditions of confinement without a showing of physical injury.

In the present case, notwithstanding the anxiety and physical discomfort Walker experienced in his 880-day period of assignment to Cell 127, the jury found he did not prove that he had any physical injury. Because § 1997e(e) bars a conditions-of-confinement award of compensatory damages for mental or emotional injury unless the prisoner has also shown physical injury, the jury should have been instructed, before it began deliberations, that if it did not find that Walker proved physical injury, it could not award him compensatory damages for mental

37

or emotional injury. And not having given that instruction, the court, once the jury had made its finding that no physical injury was proven, should at least have concluded that the PLRA's clear prohibition against recovery for mental or emotional injury in such circumstances, as reflected in § 1997e(e), meant that Walker was not entitled to compensatory damages and that the jury's award could not stand.

The court apparently declined to apply the PLRA because of its belief, discussed in the next section, that § 1997e(e) was an affirmative defense that Defendants had waived.

2. *The District Court's View of § 1997e(e)*

In rejecting Defendants' contention that the PLRA barred the jury's award of mental or emotional injury in this case, the district court noted that "[t]he PLRA's *exhaustion* requirement," set out in subsection (a) of § 1997e, "is an affirmative defense that must be pled or is waived," *Walker IV*, 463 F.Supp.3d at 341 (citing *Jones*, 549 U.S. at 212 (emphasis added)). The court viewed the text of § 1997e(e) as "closely mirror[ing]" that of subsection (a), concluded that § 1997e(e) too should be treated as

38

an affirmative defense, and found that the physical injury requirement of § 1997e(e) had been waived in this case. *Walker IV*, 463 F.Supp.3d at 341-42. We disagree with both the finding of waiver and the characterization of § 1997e(e) as an affirmative defense.

### a. *The Flawed Finding of Waiver*

In holding that Defendants had waived the right to invoke § 1997e(e), the court noted the requirement of Rule 8(c) of the Federal Rules of Civil Procedure that "a party must affirmatively state any avoidance or affirmative defense," and stated that

> [o]ne of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to *prevent surprise or unfair prejudice. . . .* Providing notice of an affirmative defense provides a plaintiff with "the opportunity to rebut it." . . . *This action was initially filed in 2011 and has been litigated throughout without assertion of that defense.* There clearly was ample time for Defendants to have asserted the defense and the *failure to do so until the end stage of this litigation clearly prejudices Plaintiff.*

*Walker IV*, 463 F.Supp.3d at 341 (other internal quotation marks omitted (emphases ours)). We cannot see that the record supports the district court's views either of Defendants' timing or of prejudice to Walker.

First, contrary to the court's finding that Defendants failed to raise the § 1997e(e) bar "throughout" the case "until the end stage of th[e] litigation," Walker's own counsel stated in discussing the § 1997e(e) issue with the court before submission of the case to the jury in 2020 that "this has been briefed several times in this case already" (Tr. 1119). For example, in 2015, the defendants moved for summary judgment in part on the basis of § 1997e(e), contending that "I. The Defendants are Entitled to Qualified Immunity," and "II. The Relief Plaintiff Seeks Is Not Available." As to the latter, the defendants argued that

> even if Plaintiff could somehow overcome the factual and legal infirmities of his claim, he has conceded that *he suffered no actual damages from the deprivations he alleges.* When asked directly whether he was injured as a result of the conduct he alleged in his complaint, Walker twice admitted that *he had no physical injuries.* Walker Dep. at 167, 14-16 (Ex. 1) ("Q. Let's start with physical. *What physical injuries*?" "A. *I don't have any.*"); 168, 2-6 ("A. *Physical* injuries stemming from being at Ray Brook? Is that what you're asking?" "Q. Right. *As a result of anything that you have alleged in your complaint.*" "A. *No,*

40

*I ain't got no physical injury.")  Absent such injury the Prison Litigation Reform Act bars recovery for any emotional damages he may assert.  42 U.S.C. § 1997e(e).*

(Memorandum of Law in Support of Defendants' Motion for Summary Judgment Dismissing the Complaint, dated November 30, 2015, at 24 (emphases ours).)  And after that summary judgment motion was denied and the case was scheduled for a 2017 trial, the defendants continued--in their pretrial briefs submitted for that trial date and for later dates to which the trial was adjourned--to contend that § 1997e(e) precludes any award of compensatory damages for mental or emotional injury absent a showing of prior physical injury, and argued that the jury should be so instructed.  (*See*, *e.g.*, Defendants' Trial Memorandum of Law dated September 11, 2017, at 4, 10-13.)

Further, it is difficult to see how the timing of Defendants' assertion of the § 1997e(e) impediment to Walker's claims for emotional and mental damages could ever have "surprise[d]" Walker.  The preclusion of a remedy for mental or emotional injury in the absence of a showing of prior physical injury is precisely what is stated in the statute.

41

It is even more difficult to see how Defendants' invocation of § 1997e(e), regardless of when made, denied Walker "the opportunity to rebut it," *Walker IV*, 463 F.Supp.3d at 341 (internal quotation marks omitted), or caused him unfair prejudice in any way. When Defendants in 2015 sought summary judgment on the ground that Walker had not shown physical injury, citing § 1997e(e), the district judge denied that motion, crediting Walker's objection to Defendants' interpretation of his deposition testimony. *See Walker III*, 2016 WL 4203536, at *6. The court noted Walker's assertion that because of the lack of a ladder in his cell, he had fallen and hurt himself; and it concluded that there was a genuine issue of fact to be tried as to whether Walker had a prior physical injury. *See id*. at *12; *id*. at *2 (Walker "states that he once fell and injured himself climbing into the top bunk"); *id*. at *6 (Walker "alleged[ that he] injur[ed] his leg" in that fall).

And in fact Walker testified at his 2020 trial that he had been injured by falling in attempting to climb down from his bunk, because there were no ladders in the cell. He testified to having pain in his knees and elbow, and to having undergone knee surgery; and he has not pointed

42

to the imposition of any limitation whatever on his ability to testify that he was physically injured while assigned to Cell 127. The fact that the jury, having heard his testimony, found that he did not prove that he suffered any physical injury cannot be attributed to any flawed conduct by Defendants.

b. *The Miscasting of § 1997e(e) as an Affirmative Defense*

Finally, and more fundamentally, we disagree with the district court's view that § 1997e(e) was intended to provide an "affirmative" defense. The fact that subsection (e) begins with language similar to that in subsection (a)--*i.e.*, "No" "action" is to "be brought"--and that *Jones* held that § 1997e(a)'s exhaustion provision is an affirmative defense, is not reason to infer that § 1997e(e) also provides only an affirmative defense. While the initial words of both subsections (a) and (e) refer to federal civil actions or federal claims, the subsections go on to impose different kinds of prerequisites for different rights. Subsection (a), stating that no action shall be brought "until" the prisoner has exhausted his administrative remedies, 42 U.S.C. § 1997e(a), imposes a precondition simply on the

43

prisoner's right to pursue a complaint in court. This exhaustion precondition is procedural; it does not purport to define claims that may be presented or to dictate their contents.

In contrast, subsection (e), titled "Limitation on recovery," is substantive. It specifies a fact--physical injury--that must be shown in order for a prisoner's claim for damages for mental or emotional injury to succeed. A prisoner's claim seeking damages for mental or emotional injury resulting from prison conditions, without a showing of physical injury, "does not comply" with § 1997e(e), *Jones*, 549 U.S. at 222, and is thus subject to dismissal for failure to state a claim, *see, e.g., Davis v. District of Columbia*, 158 F.3d at 1348-49 (affirming a *sua sponte* dismissal for failure to state a claim where complaint for mental or emotional injury did not allege physical injury as required by § 1997e(e)); *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) ("physical injury is . . . a predicate for an award of damages for mental or emotional injury").

To be sure, the failure of a complaint to state a claim for which relief can be granted is a "defense[]," Fed. R. Civ. P. 12(b)(6); but it is not an *affirmative* defense. An affirmative defense would indeed be waived by

44

the defendant's failing to assert the defense in her answer. *See* Fed. R. Civ. P. 8(c); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). But the Rule 12 defenses that are waived by a failure to assert them early are only those "listed in Rule 12(b)(2)-(5)." Fed. R. Civ. P. 12(h)(1). "Failure to state a claim upon which relief can be granted," *i.e.*, a Rule 12(b)(6) defense, "may be raised . . . at trial." *Id*. Rule 12(h)(2)(C); *see, e.g.*, *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) ("the defense of failure to state a claim is not waivable").

The district court stated that Congress's "merely labelling something a limitation on recovery does not, as Defendants appear to suggest, remove it from the realm of affirmative defenses," and it analogized § 1997e(e) to "well-established affirmative defenses" such as "laches" and "contributory negligence" that also could serve to "limit, not bar, recovery." *Walker IV*, 463 F.Supp.3d at 341. We cannot agree with this interpretation of § 1997e(e).

To begin with, any inference that Congress meant § 1997e(e)'s express ban to resemble traditional affirmative defenses that would be

45

waived if not timely raised is belied by § 1997e itself.  For example, subsection (g) of § 1997e provides that, unless the court requires an answer, *see* 42 U.S.C. § 1997e(g)(2), the defendant, in order to prevail, need not file an answer at all:

> Any defendant may waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983 of this title or any other Federal law.  *Notwithstanding any other law or rule of procedure, such waiver shall not constitute an admission of the allegations contained in the complaint.  No relief shall be granted to the plaintiff unless a reply has been filed.*

*Id*. § 1997e(g)(1) (emphasis added).  Further, subsection (c) of § 1997e provides that as to any federal action complaining of prison conditions, "[t]he court shall . . . dismiss" the action "on its own motion . . . if the court is satisfied that the action . . . fails to state a claim upon which relief can be granted."  *Id*. § 1997e(c)(1).  A defendant in such an action need do nothing.

Most importantly, an affirmative defense is traditionally one that a defendant would have the burden not only of pleading but also of proving.  As a general matter, principles as to allocation of the burden of

46

proof rest on goals and access. *See generally* 9 J. Wigmore, *Evidence* §§ 2485-2486 (Chadbourne rev. 1981). The burden of proof as to a given issue is normally placed on the party who has an affirmative goal and presumptive access to proof. *See id*.; 2 McCormick, *Evidence* § 337, at 412 (5th ed. 1999) ("The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion."). Thus, "the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (internal quotation marks omitted).

Affirmative defenses such as contributory negligence or laches involve at least some showing of affirmative facts such as the plaintiff's conduct or his knowledge of pertinent facts or events at a particular point in time. In contrast, if § 1997e(e) were an affirmative defense, it would not just relieve the prisoner--who has the affirmative goal of obtaining damages for his mental or emotional injury--of the express statutory

47

obligation to show that he had also suffered physical injury, evidence of which is presumptively accessible to him; it would also require the defendant to prove a negative (and here, if the district court's view were correct, to prove that Walker suffered no physical injury at any time in any of the 24 hours of any of the 880 days he was assigned to Cell 127). We see no reason to believe that Congress, in explicitly requiring that a prisoner seeking emotional-injury damages make "a . . . *showing* of physical injury" during his imprisonment, 42 U.S.C. § 1997e(e) (emphasis added), intended that prison officials have the burden of proving that physical injury did not occur.

We conclude that there was no waiver of the substantive requirement imposed on Walker by § 1997e(e). In light of the jury's finding that Walker did not prove he had suffered any physical injury, its award of compensatory damages for Walker's mental or emotional injury should have been stricken.

That determination, however, does not end the case, because if a constitutional "deprivation has not caused actual, provable" compensable injury, usually "the appropriate means of 'vindicating'" the

48

denied rights is an award of "nominal damages." *Memphis Community School District v. Stachura*, 477 U.S. 299, 308 n.11 (1986) (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)). But even an award of nominal damages would be foreclosed if Defendants are entitled to qualified immunity, *see, e.g., Jermosen v. Smith*, 945 F.2d 547, 548, 552 (2d Cir. 1991); *Wilkinson v. Forst*, 832 F.2d 1330, 1341-42 (2d Cir. 1987), an affirmative defense that indisputably was raised in Defendants' answers to Walker's complaint.

C. *Qualified Immunity*

The principles governing entitlement to the defense of qualified immunity are well chronicled.

> Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) ("*Zellner*") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant official's motion for dismissal on this ground as a matter of law should be granted if either the facts do not support a finding that the plaintiff's federal

49

rights were violated, or the plaintiff's right not to be subjected to the defendant's challenged conduct was, at that time of that conduct, not clearly established. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Harlow*, 457 U.S. at 818. Any disputed questions of material fact--such as the acts of the defendant and their effects on the plaintiff--are to be determined by the factfinder. *See, e.g., Zellner*, 494 F.3d at 368; *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (if there is a dispute as to the material historical facts, "the factual questions must be resolved by the factfinder").

Whether the facts as found are sufficient to establish a violation of the plaintiff's rights is an issue of law for the court. *See, e.g., Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005) (in determining whether a "violation occurred we draw all reasonable factual inferences in favor of the jury verdict, but . . . *we do not defer to the jury's legal conclusion that those facts violate the Constitution*" (emphasis added)). And if the plaintiff's right was violated, the question of whether that right was clearly established at the time of the defendant's violative conduct is likewise a question of law for the court. *See, e.g., Elder v. Holloway*, 510 U.S. 510, 516 (1994) ("[w]hether

50

an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law"); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("whether the conduct of which the plaintiff complains violated clearly established law" is an "essentially legal question").

"Once the jury has resolved any disputed facts that are material to the qualified immunity issue . . . . the court then may 'make the ultimate legal determination of whether qualified immunity attaches *on those facts*.'" *Zellner*, 494 F.3d at 368 (quoting *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (emphasis ours)). "The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury," or "findings that were implicit in the jury's verdict." *Zellner*, 494 F.3d at 371 (internal quotation marks omitted); *see, e.g., Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir. 1988) (court "cannot . . . substitute its judgment for that of the jury" (internal quotation marks omitted)). "[M]aking findings of fact and drawing factual inferences 'are jury functions, not those of a judge.'" *Zellner*, 494 F.3d at 373 (quoting

51

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150 (2000) (other internal quotation marks omitted)).

In the present case, the district court appears to have assumed that the jury's verdict established that Walker's Eighth Amendment rights had been violated. *See, e.g., Walker IV*, 463 F.Supp.3d at 328 (referring to "the Jury's verdict finding an Eighth Amendment violation"); *id*. at 336 (the evidence, viewed in the light most favorable to Walker, was sufficient for the "jur[y] to conclude that an Eighth Amendment violation took place"); *id*. at 338 ("*there has been a finding that the conditions violated the Eighth Amendment*" (emphasis added)). The jury had indeed been instructed that it could return a verdict in Walker's favor if it found that a defendant or defendants had "deprived him of minimal civilized measures of life necessities":

> Prison officials violate the Eighth Amendment when they *deprive an inmate of his basic human needs, such as food, clothing, medical care, sleep, and safe and sanitary living conditions*. For the purposes of the Eighth Amendment, Mr. Walker can demonstrate the deprivation of a Constitutional right by showing that he was incarcerated in cell 127 in the Mohawk B unit at FCI Ray Brook under conditions *that posed a substantial risk of serious damage to his health and safety **or** that the conditions which he was*

52

*forced to endure deprived him of minimal civilized measures of life necessities.*

(Tr. 1153 (emphases added).) But, while the jury was thus instructed as to the law, its job was simply to find the facts; and the district court, in describing the evidence in its posttrial Rule 50 ruling, lost sight of the jury's actual and implied factual findings.

1. *The District Court's View of the Facts*

In reviewing the district court's recitation of the facts, we note preliminarily that the court appears to have accorded weight to *Walker II*'s description of the factual allegations in Walker's complaint:

> The Second Circuit noted . . . . that "prison officials violate the Constitution when they deprive an inmate of his basic human needs, such as food, clothing, medical care, sleep, and safe and sanitary living conditions." . . . *[T]he Second Circuit concluded that [Walker's] allegations that he* was assigned to a six-man cell for twenty-eight months, during which time he had less than six square feet of moving space, *was subjected to poor ventilation and sanitation, was unable to sleep*, and was at constant risk of harm from his cellmates, sufficiently alleged cruel and unusual punishment to withstand a Rule 12(b)(6) dismissal motion.

53

*Walker IV*, 463 F.Supp.3d at 332 (quoting and citing *Walker II*, 717 F.3d at 125 (emphases ours)). But in making assessments as to whether a complaint is sufficient to withstand a Rule 12(b)(6) dismissal, a court is required to accept all plausible factual allegations of the complaint as true. The truth of allegations, to the extent that they are supported by evidence, is tested at trial; and it is the factfinder--in this case, a jury--that determines the facts.

In *Walker IV* the district court proceeded to summarize trial evidence presented in support of Walker's allegations; but most of its description did not reflect the factual findings of the jury. The court stated:

> At trial, *Plaintiff presented testimony* about each of [his] allegations, . . . in particular, that Cell 127 was severely overcrowded, violent, *unsanitary*, *loud*, and *poorly ventilated*. *See generally* Tr. at pp. 109-370. The parties stipulated to the actual dimensions of this six-man cell which, when fully occupied, left an unencumbered space per inmate of slightly over 16 feet or, stated in other terms, slightly more than a four-by-four-foot square. Pl. Tr. Ex. 110. *Plaintiff testified in detail* regarding the unique overcrowding and *sanitary issues* that were presented by the cell, and the danger of physical violence that resulted. *See, e.g.*, Tr. at pp. 110 & 121-126. *Plaintiff's testimony was* that, because of these

54

overcrowded conditions and the resulting complications, he did not feel safe during his entire time within the cell. Tr. at pp. 120 & 123. He had *trouble sleeping*, averaging only three and a half hours per night.

*Walker IV*, 463 F.Supp.3d at 332-33 (footnote omitted) (emphases added); *see also id*. at 333, 335 (referring to Walker's conditions as "inhumane").

The court's descriptions, however--except for the overcrowding and the attendant diminution of safety--did not reflect the particularized findings made by the jury. As indicated in Part I.D. above, the jury's "Yes" response to the first question in the Jury Verdict Form had been ambiguous, because the question itself posed alternative facts that the jury could find and then had the jury simply check either "Yes" or "No." The question was whether the jury found that Walker had shown

that his imprisonment in Cell 127 denied him the minimal civilized measure of life's necessities or basic human needs *or* that the conditions in Cell 127 posed a substantial risk of serious damage to his health or safety[.]

(Jury Verdict Form, Part I.1. (emphasis added).) The ambiguity of the jury's "Yes," however, was dissipated when the jury responded to the

follow-up interrogatories that asked it to specify which of the claimed conditions it had found established, which were listed as follows,

        a.  overcrowding/lack of space
        b.  lack of sanitation/cleaning supplies
        c.  threats of violence/lack of safe living conditions
        d.  inability to sleep
        e.  excessive heat or lack of ventilation

(Court Exhibit 6), and the jury checked only items "a." and "c.," that is, it found only "overcrowding/lack of space" and "threats of violence/lack of safe living conditions" (Int. 1). Despite those limited findings, the district court stated that "*the Jury unanimously concluded . . . that the conditions of confinement faced by [Walker]*, as measured by their intensity and duration, *deprived him of life's basic necessities*," *Walker IV*, 463 F.Supp.3d at 337 (emphases added). But in answering that first interrogatory as it did, the jury clearly showed that it had not found deprivations of any of the basic life necessities at issue here, because it explicitly indicated that it had rejected the claims that Walker had been injured by "excessive heat," or "lack of ventilation," or "inability to sleep," or "lack [of] cleaning supplies," or "lack of sanitation" (Int. 1).

56

Instead, the jury found as facts only that Walker suffered mental or emotional injury because of "overcrowding/lack of space" and "threats of violence/lack of safe living conditions." (*Id.*) And despite those "threats," any actual violence and deprivation of safety were unrealized, as the jury had found that Walker did not prove physical injury.

2. *The State of the Law as to Prison Overcrowding*

As discussed in Part II.A. above, "overcrowding" itself, *i.e.*, "confin[ing] cellmates too closely," does not violate the Eighth Amendment unless it is accompanied by some treatment that "deprive[s] inmates of the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 340, 347. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities[]' . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347).

Walker has not called to our attention any Supreme Court case--and we know of none--in which the Eighth Amendment's prohibition

57

against cruel and unusual punishment was held to have been violated by prison overcrowding alone. Indeed, the principle that overcrowding in and of itself is not considered an Eighth Amendment violation is illustrated by, for example, remedial orders that were approved in *Brown v. Plata*, 563 U.S. 493 (2011), which principally involved unconstitutional denials of medical care that resulted primarily from extreme prison overcrowding. One approved remedy was an order that the state "reduce its prison population *to 137.5% of the prisons' design capacity*," *id*. at 509-10 (emphasis added). Further, that goal was for 137.5% of design capacity as a statewide average, with the understanding that some facilities could transfer prisoners to other prisons "that are better able to *accommodate overcrowding*," *id*. at 533 (emphasis added).

In sum, to the extent that the district court concluded that Walker established an Eighth Amendment violation based not solely on overcrowding and its attendant decrease in safety from violence but also on deprivations of such basic necessities as sleep, ventilation, or sanitary living space, the court impermissibly relied on its own view of the facts, and thereby invaded the province of the jury.

To the extent that the court instead did not rely on facts beyond the jury's findings of overcrowding and the attendant decrease in safety, those factual findings by the jury should also have informed the legal determination by the district court as to whether Defendants were entitled to qualified immunity. In light of the authorities discussed above, the jury's findings were insufficient to support a conclusion that Walker was deprived of the minimal civilized measure of life's basic necessities. It may be that the findings that the (unrealized) threat of violence and the constant anxiety as to lack of safety resulting from the undisputed overcrowding--here lasting for some 2½ years--which led the jury to find that Walker had suffered mental or emotional injury, were sufficient to warrant a decision that Walker was subjected to cruel and unusual psychological punishment, thereby warranting an award of nominal damages. But we need not resolve that question, because we see no authorities that clearly established such a legal principle. In the absence of clearly established law to inform Defendants that their conduct in not moving Walker to another cell in an overcrowded prison violated Walker's

59

rights under the Eighth Amendment, Defendants were entitled to qualified immunity from his claims for damages, including for nominal damages.

CONCLUSION

We have considered all of Walker's arguments on this appeal in support of the judgment in his favor and, for the reasons stated above, have found them to be without merit. In sum:

(1) The PLRA provision in 42 U.S.C. § 1997e(e) precludes a prisoner's recovery of compensatory damages for mental or emotional injury resulting from his conditions of confinement absent a showing of physical injury.

(2) Section 1997e(e) makes physical injury an element of such a claim for mental or emotional injury, and is not an affirmative defense that would be subject to waiver if not presented in the defendant's answer.

(3) In light of § 1997e(e), the jury's finding that Walker failed to prove that the prison conditions of which he

60

complained caused him physical injury precluded an award to him of compensatory damages for such mental or emotional injury as the jury found he suffered based on the conditions it found existed.

(4) Even if the jury's findings of fact warranted a conclusion that Walker's Eighth Amendment rights were violated by deliberate indifference to cruel and unusual psychological punishment caused by overcrowding, thereby in principle entitling Walker to an award of nominal damages, Defendants are entitled to qualified immunity from such an award because a prisoner had no clearly established constitutional right to be transferred to a new cell on account of overcrowding.

(5) Walker's claims for equitable relief, including requests for a transfer to a new cell or for a reduction in his prison term to offset the time spent in overcrowded conditions, became moot in 2016 when he was released from prison.

So much of the district court's judgment as granted relief to Walker against defendants Schult and Sepanek is reversed, and the matter is remanded for entry of a judgment of dismissal.

No costs.